1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                             **EASTERN DIVISION**

11

12   CHARLENE G.,                          )      No. ED CV 18-764-PLA
                                           )
13                    Plaintiff,           )      **MEMORANDUM OPINION AND ORDER**
                                           )
14            v.                           )
                                           )
15   NANCY BERRYHILL, DEPUTY               )
     COMMISSIONER OF OPERATIONS            )
16   FOR THE SOCIAL SECURITY               )
     ADMINISTRATION,                       )
17                                         )
                      Defendant.           )
18   _____)

19                                   **I.**

20                              **PROCEEDINGS**

21          Charlene G.[1] ("plaintiff") commenced this action on April 16, 2018 (ECF No. 1), and filed

22   a First Amended Complaint (ECF No. 7) on April 17, 2018, seeking review of the Commissioner's[2]

23   denial of her applications for Disability Insurance Benefits ("DIB") and Supplemental Security

24   _____

25          [1]    In the interest of plaintiff's privacy, this Memorandum Opinion and Order uses plaintiff's (1)
26   first name and last initial, and (2) year of birth in lieu of a complete birth date.  See Fed. R. Civ.
     P. 5.2(c)(2)(B), Local Rule 5.2-1.

27          [2]    As of November 17, 2017, Berryhill has been leading the agency from her position of
28   record, Deputy Commissioner of Operations.

Income ("SSI") payments.  The parties filed Consents to proceed before a Magistrate Judge on May 4, 2018, and May 22, 2018.  Pursuant to the Court's Order, the parties filed a Joint Stipulation (alternatively "JS") on February 19, 2019, that addresses their positions concerning the disputed issues in the case.  (ECF No. 26).  The Court has taken the Joint Stipulation under submission without oral argument.

**II.**

**BACKGROUND**

Plaintiff was born in 1960.  [Administrative Record ("AR") at 120, 125.]  She has past relevant work experience as an administrative clerk, a claims adjuster, an office manager, and a retail store manager.  [AR at 2323, 2343-44.]

On April 18, 2008, plaintiff filed an application for a period of disability and DIB, and an application for SSI payments, alleging that she has been unable to work since June 30, 2005.  [AR at 120-29.]  After her applications were denied initially, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR at 87.]  A hearing was held on November 2, 2009, and an unfavorable decision issued on January 12, 2010.  [AR at 20-34, 35-74.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [AR at 13-19.]  When the Appeals Council denied plaintiff's request for review on March 30, 2012 [AR at 1-6], the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).

Plaintiff then filed an action with this Court in case number ED CV 12-802-CW, and on August 28, 2013, the Magistrate Judge assigned to that case remanded the matter.  [AR at 1506-14.]  On remand, a hearing before a different ALJ was held on October 27, 2014 [AR at 1424-73], and an unfavorable decision issued on January 9, 2015.  [AR at 1361-89.]  Plaintiff filed exceptions to the Appeals Council on April 28, 2015 [AR at 1352-55], and on August 8, 2015, the Appeals Council declined to take jurisdiction.  [AR at 1345-51.]

Plaintiff filed a second action in this Court in case number ED CV 15-2058-PLA, and on November 15, 2016, this Court remanded the matter back to the Agency.  [AR at 2420.]  The

Court directed the ALJ to further explain the residual functional capacity ("RFC") assessment and address the apparent conflict between the jobs provided by the vocational expert ("VE") and the Dictionary of Occupational Titles ("DOT") as it relates to a sit/stand option.[3] [AR at 2420-34.] On August 1, 2017, a new hearing was held before yet another ALJ, at which time plaintiff appeared represented by an attorney, and testified on her own behalf. [AR at 2335-51.] A VE also testified. [AR at 2343-49.] On June 30, 2018, a partially favorable decision issued, finding that plaintiff became disabled on December 30, 2015, and, therefore, may be eligible for SSI payments after that date. [AR at 2309-34.] On the 61st day following the ALJ's partially favorable decision, that part of the decision became the final decision of the Commissioner. 42 U.S.C. § 405(h). This action followed.

## III.

## <u>STANDARD OF REVIEW</u>

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. <u>Berry v. Astrue</u>, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Revels v. Berryhill</u>, 874 F.3d 648, 654 (9th Cir. 2017) (citation omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." <u>Id.</u> (internal quotation marks and citation omitted). However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific

---

[3] The ALJ in the 2015 decision found that plaintiff "can stand and walk for six hours out of an eight-hour workday, but she cannot perform prolonged walking greater than 30 minutes at a time. She can sit for six hours out of an eight-hour workday with the ability to stand and stretch not to exceed 10% of the time." [AR at 1368.] The ALJ in the decision at issue here did not include a sit/stand option.

quantum of supporting evidence." Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)).  The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed.  626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting 42 U.S.C. § 423(d)(1)(A)).

## A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lounsburry v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006) (citing Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999)). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Lounsburry, 468 F.3d at 1114.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id.  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P,

appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that she is unable to perform past relevant work. Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). If the claimant meets this burden, a prima facie case of disability is established. Id. The Commissioner then bears the burden of establishing that the claimant is not disabled because there is other work existing in "significant numbers" in the national or regional economy the claimant can do, either (1) by the testimony of a VE, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P, appendix 2. Lounsbury, 468 F.3d at 1114. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 721, 828 n.5 (9th Cir. 1995); Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 30, 2005, the alleged onset date.[4] [AR at 2317.] At step two, the ALJ concluded that since the alleged onset date, plaintiff has had the severe impairments of cervical degenerative disc disease; bilateral carpal tunnel syndrome ("CTS"), status post left cubital release; fibromyalgia; inflammatory arthritis; and major depressive disorder. [Id.] At step three, the ALJ determined that since the alleged onset date, plaintiff has not had an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing. [Id.] The ALJ further found that since the alleged onset date, plaintiff has had the RFC[5] to perform a range of light work as

---

[4]    The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through June 30, 2010. [AR at 2317.]

[5]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which (continued...)

5

defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b),[6] as follows:

> [She] can lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently climb, balance, stoop, kneel, crouch, and crawl; and frequently handle and finger. Additionally, [she] is limited to unskilled work with occasional contact with coworkers and the general public.

[AR at 2319.] At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that since the alleged onset date, plaintiff is unable to perform her past relevant work as an administrative clerk, a claims adjuster, an office manager, and a retail store manager. [AR at 2323, 2345-46.] The ALJ noted that prior to the established disability onset date, plaintiff was a younger individual aged 18-49 [AR at 2324], and that on December 30, 2015, her age category changed to an individual of advanced age. [Id.] The ALJ also determined that prior to December 30, 2015, transferability of job skills was not material to the determination of disability because using the Medical Vocational Rules as a framework, plaintiff is "not disabled," whether or not she has transferable job skills. [Id.] He also found that beginning on December 30, 2015, plaintiff "has not been able to transfer job skills to other occupations." [Id. (citations omitted).] At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that prior to December 30, 2015, there were jobs existing in significant numbers in the national economy that plaintiff could have performed, including work as a "mail clerk" (DOT No. 209.687-026), an "assembler, electrical accessories" (DOT No. 729.687-010), and an "assembler, plastic hospital products" (DOT No. 712.687-010). [AR at 2325, 2346-47.] Thus, plaintiff was not under a disability at any time through June 30, 2010, plaintiff's date last insured and, therefore, was not

---

[5](...continued)
the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

entitled to DIB. [AR at 2325.] He also determined that due to her change in age category, plaintiff became disabled on December 30, 2015, and that as of that date there are no jobs that exist in significant numbers in the national economy that plaintiff can perform. Therefore, depending on non-disability requirements, plaintiff may be eligible for SSI payments as of that date. [AR at 2325, 2326.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when he: (1) (a) discounted the opinions of treating physicians Phot Luisiri, M.D. who is board-certified in rheumatology and internal medicine, and Rodrigo Rodriguez Jr., M.D., who is board-certified in neurology and clinical neurophysiology, and (b) gave the opinions of the consultative examiner, Nicolas Lin, M.D., who is board-eligible in internal medicine, and the state agency medical consultant, C. Jue (credentials unknown), greatest weight; (2) considered the opinion of plaintiff's consultative examining neurologist, Sarah L. Maze, M.D.; and (3) considered the opinions of the examining psychologist, Mark D. Pierce, Ph.D. [JS at 8, 26.] As set forth below, the Court agrees with plaintiff and remands for payment of benefits.

## A.    LEGAL STANDARD

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527.[7] The Ninth

---

[7]    The Court notes that for all claims filed on or after March 27, 2017, the Rules in 20 C.F.R. § 404.1520c (not § 404.1527) shall apply. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. Thus, the new regulations eliminate the term "treating source," as well as what is customarily known as the treating source or treating physician rule. See 20 C.F.R. § 404.1520c; see also 81 Fed. Reg. 62560, at 62573-74 (Sept. 9, 2016). However, the claim in the present case was filed before March 27, 2017, and the Court therefore analyzed plaintiff's claim pursuant to the treating source rule set out herein. See also 20 C.F.R. § 404.1527
(continued...)

Circuit has recently reaffirmed that "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" Trevizo v. Berryhill, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)) (second alteration in original).  Thus, "[a]s a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  Lester, 81 F.3d at 830; Garrison, 759 F.3d at 1012 (citing Bray v. Comm'r Soc. Sec. Admin., 554 F.3d 1219, 1221, 1227 (9th Cir. 2009)); Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician."  Lester, 81 F.3d at 830; Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008).

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons."  Trevizo, 871 F.3d at 675 (citing Ryan, 528 F.3d at 1198).  "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  Id. (citing Ryan, 528 F.3d at 1198).  When a treating physician's opinion is not controlling, the ALJ should weigh it according to factors such as the nature, extent, and length of the physician-patient working relationship, the frequency of examinations, whether the physician's opinion is supported by and consistent with the record, and the specialization of the physician.  Trevizo, 871 F.3d at 676; see 20 C.F.R. § 404.1527(c)(2)-(6).  The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998).  The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or examining] doctors', are correct."  Id.

Although the opinion of a non-examining physician "cannot by itself constitute substantial

[7](...continued)
(the evaluation of opinion evidence for claims filed prior to March 27, 2017).

evidence that justifies the rejection of the opinion of either an examining physician or a treating physician," Lester, 81 F.3d at 831, state agency physicians are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); Soc. Sec. Ruling 96-6p; Bray, 554 F.3d at 1221, 1227 (the ALJ properly relied "in large part on the DDS physician's assessment" in determining the claimant's RFC and in rejecting the treating doctor's testimony regarding the claimant's functional limitations). Reports of non-examining medical experts "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

## B.     MEDICAL OPINIONS

### 1.     Treating Providers Dr. Luisiri and Dr. Rodriguez

On October 12, 2011, Dr. Luisiri provided a letter in support of plaintiff's claim ("Letter"). [AR at 1828.] In the Letter, Dr. Luisiri noted that he had been treating plaintiff since September 2008, first for generalized pain, but which was later diagnosed as fibromyalgia. [Id.] He noted that since 2001 plaintiff "has suffered from constant generalized muscle and joint pain," and that multiple treatments had been tried without success. [Id.] Despite her current treatment with a Fentanyl patch, "which is normally prescribed to treat cancer pain," Dr. Luisiri noted that plaintiff "continues to have significant pain and discomfort," and that he believed that all treatments in her case had been exhausted and her condition "will not improve." [Id.] He concluded that plaintiff is "disabled from chronic severe pain." [Id.]

On June 4, 2014, Dr. Luisiri completed an "Ability to Do Work-Related Activities (Physical)" questionnaire ("Work Questionnaire"). [AR at 1819-20, 1822.] The pages of Dr. Luisiri's Work Questionnaire appear to be intermingled with the pages of the "Environmental Restrictions Questionnaire" ("ER Questionnaire") that he also completed on June 4, 2014.[8] [AR at 1818,

_____

[8]     The three non-consecutive pages 1819, 1820 and 1822 appear to belong to the Work Questionnaire, based on the numbering of the items on those three pages (1-5, 6-9, and 10-12
(continued...)

1821.]

In the Work Questionnaire, Dr. Luisiri opined that plaintiff could lift and carry no more than ten pounds occasionally, and less than ten pounds frequently; could stand and walk less than two hours in an eight-hour workday; could sit about two hours in an eight-hour workday; could sit for 45 minutes and stand for 30 minutes before needing to change position; must walk around every 45 minutes for 10 minutes at a time; and needs to be able to shift at will from sitting or standing/walking. [AR at 1819-20.] He noted that previous joint swelling and elevated SED rate and C-reactive protein levels support the limitations found. [AR at 1820.] He further stated that she could never twist, stoop/bend, crouch, or climb stairs or ladders, and that pain affects her ability to reach (including overhead), and pushing/pulling. [Id.] He found no limitation in gross handling, fine manipulation, or feeling. [Id.] He also noted that extreme cold, heat, wetness, humidity, noise, fumes, and hazards are all environmental factors that make her pain worse and stated that she should avoid even moderate or all exposure to these factors. [AR at 1822.] He concluded that she would be absent from work more than three times a month. [Id.]

In the ER Questionnaire, Dr. Luisiri noted that he had treated plaintiff on four dates in 2009, one date in 2010, one date in 2011, and one date in 2014, and that plaintiff was diagnosed with fibromyalgia, inflammatory arthritis, and chronic pain as evidenced by previous joint swelling. [AR at 1818.] He noted that she should avoid all exposure to extreme cold and heat, high humidity, wetness, fumes, and dust. [AR at 1821.] Dr. Luisiri also noted that plaintiff's emotional stress makes her pain worse and stated -- without explanation -- that "there is some discrepancy between impairment/physical finding & functional limitation." [AR at 1818.]

On June 25, 2014, Dr. Rodriguez also completed a Work Questionnaire [AR at 1823-24, 1827] and an ER Questionnaire.[9] [AR at 1825-26.]

_____

[8](...continued)
respectively); the two non-consecutive pages 1818 and 1821 appear to belong to the ER Questionnaire, based on the numbering of the items on those two pages (1-7 and 8-9 respectively).

[9]    As with Dr. Luisiri's two Questionnaires [see supra note 8], the pages of Dr. Rodriguez' two
(continued...)

In Dr. Rodriguez' Work Questionnaire, he opined that plaintiff could lift less than ten pounds occasionally and frequently; could stand and walk less than two hours in an eight-hour workday; could sit less than two hours in an eight-hour workday; could sit for 20 minutes and stand for 20 minutes before needing to change position; must walk around every 15 minutes for 15 minutes at a time; and needs to be able to shift at will from sitting or standing/walking. [AR at 1823-24.] He noted that these limitations were supported by plaintiff's "severe cerebrovascular disease, causing severe spasticity of the [bilateral lower extremities]," and that she "cannot ambulate well and is thus neurologically impaired." [AR at 1824.] He further stated that she could never or rarely twist, stoop/bend, crouch, or climb stairs or ladders. [Id.] He also stated that her impairments impact her ability to reach (including overhead), finger, feel, and push/pull. [Id.] He found no limitation in gross handling. [Id.] He concluded that plaintiff's severe spasticity limits her ability to move around and that she cannot handle heavy objects or ambulate for extended lengths of time. [AR at 1827.] He stated she "is permanently disabled." [Id.] Dr. Rodriguez indicated that his opinion was supported by plaintiff's cerebrovascular disease and MRI findings, which were consistent with "white matter disease." [AR at 1824.]

In his ER Questionnaire, Dr. Rodriguez noted that he had treated plaintiff for 7.5 years for her cerebrovascular disease and primary neurodegenerative disorder, which were evidenced by MRI findings that were consistent with cerebrovascular disease and atrophy, and clinical examinations that were consistent with plaintiff's severe limb spasticity. [AR at 1825.] He opined that plaintiff should avoid concentrated exposure to extreme cold and heat, high humidity, wetness, fumes, dust, and chemicals. [AR at 1826.] Dr. Rodriguez also noted that emotional factors do not contribute to the severity of plaintiff's symptoms and limitations, and that her impairments are reasonably consistent with the functional limitations (environmental) that he found. [AR at 1825.] He concluded that she has "chronic severe spasticity causing limited use of her limbs," and she "also suffers from joint pain." [AR at 1826.] He also stated that the "earliest

_____

[9](...continued)
Questionnaires are intermingled.

date the description of limitations in [the] questionnaire applie[d]" was June 2008. [AR at 1825.]

The ALJ gave "little weight" to the opinions of Dr. Luisiri and Dr. Rodriguez "that indicated [plaintiff] was limited to less than sedentary work, would miss work more than three times a month, was permanently disabled, or was disabled because of chronic pain," for the following reason:

> While not inconsistent with the ultimate finding herein that [plaintiff] is disabled, the undersigned finds little support for these statements considering [plaintiff's] activities. The record showed [she] was able to take care of personal tasks, travel on a cruise, exercise, and attend to daily tasks. Therefore, the undersigned finds the [RFC] herein to be more appropriate.

[AR at 2323.]

An ALJ may reject a medical opinion regarding a claimant's mental health because the claimant's activities of daily life contradict it, but only if substantial evidence supports that conclusion. See Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (finding that inconsistency between doctor's opinion and claimant's "maintaining a household and raising two young children, with no significant assistance from her ex husband" supported discounting the doctor's opinion). The record must provide details about the nature, extent, and frequency of the activities for them to "constitute 'substantial evidence' inconsistent with [an examining physician's] informed opinion." Trevizo, 871 F.3d at 666.

Additionally, "[l]ong-standing principles of administrative law require [this Court] to review the ALJ's decision based on the reasoning and factual findings offered *by the ALJ* -- not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." Bray, 554 F.3d at 1225-26 (emphasis added, citation omitted); Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001) ("[W]e cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision."). The Court will not consider reasons for rejecting the doctors' opinions that were not given by the ALJ in the decision. See Trevizo, 871 F.3d at 677 & nn. 2, 4 (citation omitted).

First, as noted by plaintiff, the only mention of a cruise in the record is an October 1, 2007, treatment note, which stated: "Form filled out for patient's cruise this Sunday." [JS at 11 (citing AR at 693).] That treatment note also reflects that plaintiff was planning to schedule a cervical epidural steroid injection, that a recent lumbar epidural steroid injection had provided her with

some relief of pain, that trigger point injections did not help her neck or leg, and that the treating provider also planned to send an "additional" acupuncture request. [AR at 692-93.] Plaintiff notes that the form may have been filled out for medical necessity, and there is no evidence that she actually went on a cruise or that she continued to travel. [JS at 11.] The Court agrees that without more, and even assuming plaintiff went on a cruise, this isolated note does not constitute substantial evidence of a level of activity inconsistent with the limitations suggested by Dr. Luisiri and Dr. Rodriguez. Indeed, based on the fact that plaintiff's doctor was asked to complete a form prior to the cruise, it is not unreasonable to assume that the purpose of the form was to inform the cruise line in advance regarding some sort of "medical necessity" or medical accommodation needed by plaintiff while on the cruise.

Second, the ALJ failed to provide any details about the "nature, extent, and frequency" of plaintiff's alleged exercise activity, sufficient to constitute substantial evidence inconsistent with the opinions of plaintiff's treating physicians. Elsewhere in the decision, the ALJ noted that plaintiff "was advised to participate in regular exercise" [AR at 2320 (citing AR at 754-57)], but a review of those records reflects that she told the provider at that visit that she "doesn't exercise because it hurts too much" [AR at 754] and the provider advised her to participate in aerobic exercise, "preferably water aerobics 3-4 times a week," i.e., a low-impact aerobic exercise. [AR at 757.] Notwithstanding defendant's citation to other records relating to plaintiff's medical providers purportedly recommending that she exercise [JS at 21 (citing AR at 761, 831, 844, 901, 1088)], those records also reflect that one provider encouraged plaintiff to continue exercise, "but not to overdo things" [AR at 761]; two notes make reference to continuing a home exercise program for her shoulder and neck pain [AR at 831, 901]; one suggests regular swimming [AR at 844]; and another occurred during a discussion Dr. Luisiri had with plaintiff warning her about taking "too many pharmacologic treatments as they are not effective and some of them can be addictive," and advising plaintiff to "have [a] positive attitude and try to get into a routine exercise program," as her "current narcotic dose is maximized" and he did not recommend that she increase it. [AR at 1088.]

Defendant (unlike the ALJ who only generally asserted that plaintiff admitted she was able

to exercise) points to specific records purportedly demonstrating plaintiff's "admissions" of her ability to exercise. [JS at 21 (citing AR at 1145 (October 2010 record reflecting that plaintiff was exercising), 1842 (October 2014 record noting that plaintiff exercises 20 minutes, three days a week "at a moderate or strenuous level"), 2246 (January 2015 record showing same), 2247 (January 2015 note stating plaintiff exercises 20 minutes three days per week at a moderate or strenuous level, and should "continue to stay active with stretches and exercises"), 2249 (January 2015 note stating plaintiff exercises 20 minutes three days per week at a moderate or strenuous level), 2293 (February 2015 record showing same exercise schedule, and stating that plaintiff should "[c]ontinue to stay active with stretches and exercises"), 2638 (March 2015 record showing plaintiff exercises 30 minutes, four days a week "at a moderate or strenuous level"), 2691 (May 2015 record showing she exercises 20 minutes, three days a week "at a moderate or strenuous level")).]  Even if the ALJ was impliedly referring to these or similar records when he discounted the opinions of Dr. Luisiri and Dr. Rodriguez, however, there is little to no indication in the record as to what exercises plaintiff was doing (other than stretches), what she meant by "moderate or strenuous," whether she was regularly doing such exercises between October 2010 and October 2014, whether she needed to take breaks during her exercise sessions, or any other information about the frequency, nature, and extent of her exercise during the relevant time period prior to December 2015.  Thus, references in the record to plaintiff's ability to exercise do not constitute substantial evidence.  Further, as noted previously, there is at least one record reflecting that plaintiff complained in 2008 that she could not exercise because her pain was too great, which led to the provider encouraging her to try low-impact water aerobics.  [AR at 754.]

Similarly, the ALJ provides little to no information as to the frequency, nature, and extent of the "personal tasks" or "daily tasks"[10] that he found sufficient to refute the opinions of Drs. Luisiri and Rodriguez.  Elsewhere in the decision he mentions that plaintiff stated in her Adult Function Report that she "went outside two to three times a week to go to appointments and to water the yard," was able to drive to get around, watched television as her hobby, and talked on the phone

---

[10]    The "tasks" that the ALJ might have included as "personal" or "daily" are not clear.

with others or had visitors over [AR at 2319-20 (citing AR at 170-77)]; acknowledged that she was able to drive and do some household chores [AR at 2320 (without citation)]; reported in January 2015 that she was able to complete her activities of daily living with medication [AR at 2322 (citing AR at 2246)]; told consultative psychologist Dr. Pierce in 2008 that she dresses and bathes herself with help, and gets along "excellently" with others [Id. (citing AR at 558-62)]; and told Dr. Pierce in 2014 that she occasionally performs household chores, gets along "good" with others, and handles her own money.  [Id. (citing AR at 1669-79).]  The records the ALJ cited to, however, clearly reflect that the frequency, nature, and extent of these activities is restricted.  For instance, in her Adult Function Report, plaintiff reported that she needs help getting her clothes on; it is hard to bathe because she cannot raise her arms; she is unable to wash her hair by herself; she does not style her hair; she has a hard time bending over to shave her legs; she "force[s]" herself to water outside for about an hour 1-2 times per week, "which usually make[s] [her] worse" but she does not want to give up; she is unsteady on her feet; she handles her own money but gets confused counting change; and check writing is too hard with her osteoarthritis and carpal tunnel, so she pays her bills and handles her savings on the computer with help from her daughter.  [AR at 170-77.]  Then, in addition to plaintiff telling Dr. Pierce in 2008 that she *needed help* dressing and bathing herself, she also told him that she was unable to perform household chores, go shopping, or do cooking; that she is "rarely" able to drive; that she likes to handle her own money but can only do so "depending on [her] body"; and that she "went from a hard-working, climb the ladder quickly employee, dirt bike rider, water skier, to an 80-year-old body that needs help with very basic tasks."  [AR at 559.]  In June 2014, what plaintiff told Dr. Pierce (and he reported) was that although she is able to dress and bathe herself, she has "pain and stiffness so at times [she] can't get dressed"; she performs household chores "*occasionally*"; she does not go shopping or do cooking; she is able to drive but her husband "mostly" does the driving; and before becoming disabled she "[u]sed to work 40+ hours, water ski, ride dirt bikes, snow ski, surf, bake, and cook" and that she had "so much energy, beach trips, camping and raised 3 children" on her own for 13 years.  [AR at 1670-75.]  Indeed, Dr. Pierce observed that plaintiff "presently completes few physical tasks beyond dressing and bathing, has a[n] extremely variable sleep pattern and limited

appetite, all of which appear to be reflected in her decreased cognitive testing performance today, against a consistently strong effort put forth." [AR at 1675.] Finally, there is no indication in the June 2015 treatment note (which the ALJ noted demonstrated that plaintiff was able to complete her activities of daily living with medication) as to the specific activities of daily living plaintiff was able to perform with her medication, and on examination that date she still exhibited back pain, joint pain, headaches, and decreased range of motion and tenderness in her right knee. [AR at 2246.]

An ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the record that bolster his findings. See, e.g., Holohan v. Massanari, 246 F.3d 1195, 1207-08 (9th Cir. 2001) (holding that an ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others); Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) ("[T]he [ALJ]'s decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'") (citing Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998)); see also Reddick, 157 F.3d at 722-23 (it is impermissible for the ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony and reports"); Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is not permitted to reach a conclusion "simply by isolating a specific quantum of supporting evidence."); Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982) ("[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.") (citation omitted); Switzer v. Heckler, 742 F.2d 382, 385-86 (7th Cir. 1984) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."). Here, the ALJ did not identify substantial evidence that contradicted the treating source opinions and ignored the probative evidence that supported those opinions.

Because the ALJ's reason for discounting the opinions of Dr. Luisiri and Dr. Rodriguez lacked specificity and ignored relevant supporting information, he did not provide a specific and legitimate reason supported by substantial evidence to discount their opinions.

### 2. Dr. Lin and C. Jue

On June 6, 2008, Dr. Lin conducted a consultative internal medicine examination. [AR at 550-55.] According to Dr. Lin, the only source of information for his evaluation was plaintiff herself -- he had "no medical records available for review." [AR at 550, 551.] Based on his examination, Dr. Lin reported the following: "[s]traight leg raising test is negative bilaterally at 60 degrees,[11] both sitting and supine"; "[r]ange of motion of the back is to 60 degrees in forward flexion; otherwise, grossly normal"; positive Tinel and Phalen tests in both wrists; plaintiff experienced severe tenderness during deep palpation of tender points (left lower cervical, left trapezius area, second rib at costochondral junction bilaterally, and gluteal and greater trochanteric areas bilaterally); she has had epidural injections in the neck and lower back due to arthritic pains; and she can walk up to one block during ambulation with the help of a walker due to pain, "especially in both legs." [AR at 554.] Dr. Lin opined that based on his evaluation "and available information," plaintiff can lift or carry 20 pounds occasionally and 10 pounds frequently; sit, stand or walk up to six hours in an eight-hour workday; bend, stoop, crouch, and kneel frequently; and do fine and gross manipulation frequently. [Id.]

On June 26, 2008, and on June 30, 2008, "C. Jue," identified by the two pre-printed forms only as a "Medical Consultant," completed a Physical Residual Functional Capacity Assessment [AR at 564-69] and a Case Analysis, respectively. [AR at 585-86.] C. Jue reviewed only exhibits 1F through 3F of the administrative record [AR at 453-57 (medical evidence from Kaiser dated October 14, 2005, to February 13, 2008), 448-49 (medical evidence from Kaiser dated October 18, 2006, to April 18, 2008), 550-57 (Dr. Lin's June 6, 2008, evaluation).] C. Jue opined that plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; sit, stand and/or walk about six hours in an eight-hour workday; was unlimited in her ability to push and/or

---

[11] This begs the question of whether the test was positive bilaterally at greater than 60 degrees as positive straight leg testing results are generally indicative of *lower* back issues, an impairment that is not alleged herein. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04 (noting that to establish disability due to a disorder of the spine, Listing 1.04 requires nerve root compromise, as well as limitation of spine motion and, in the case of lower back impairments, a positive straight leg raising test).

1  pull; could frequently climb ramp/stairs and ladder/rope scaffold, balance, stoop, kneel, crouch,

2  or crawl; could reach in all directions (including overhead); and could frequently handle and finger.

3  [AR at 555-56.]

4          With respect to the opinions of Dr. Lin and C. Jue, the ALJ stated the following:

5          [T]he undersigned gives great weight to the consultative examiner, Dr. Lin; and to
           the State agency medical consultant[] [C. Jue] who opined [plaintiff] was limited to
6          the same range of light work as assessed herein.  The undersigned finds this [sic]
           opinion[s] to be reasonable and consistent with the record as a whole.  Specifically,
7          the objective findings of degeneration in [plaintiff's] cervical spine, diagnosis of
           fibromyalgia, and consistent use of pain medications and invasive treatment.

8

9  [AR at 2323 (citing AR at 550-55, 565-69, 585-86).]

10         Plaintiff argues that there is no evidence that "medical consultant" C. Jue is an M.D. or

11  other medical professional.  [JS at 12 (citing AR at 569, 586).]  Additionally, C. Jue reviewed only

12  exhibits 1F through 3F[12] of the otherwise voluminous record and never examined plaintiff.  [JS at

13  13 (citing AR at 453-57 (1F), 458-549 (2F), 550-57 (3F)).]  She argues, therefore, that the opinions

14  of C. Jue are not substantial evidence.  Plaintiff also submits that Dr. Lin, who is board-eligible in

15  internal medicine, did not review *any* medical records and, although his physical examination of

16  plaintiff showed a number of issues (e.g., positive Tinel and Phalen tests bilaterally; severe

17  tenderness to deep palpation of tender points), he nevertheless opined that plaintiff could lift and

18  carry ten pounds frequently and engage in frequent postural, gross, and fine manipulations.  [Id.

19  (citing AR at 553, 554).]  Additionally, Dr. Lin did not have the benefit of plaintiff's medical records

20  to that date, or Dr. Luisiri's and Dr. Rodriguez' opinions.  [JS at 13-14 (citations omitted).]  Finally,

21  plaintiff notes that Dr. Luisiri and Dr. Rodriguez are both board-certified in their specialities --

22  rheumatology and neurology -- which are the most applicable specialties in light of plaintiff's

23  impairments.  She argues that the ALJ "went against state agency policy" when he gave greater

24  weight to the opinions of the non-specialist consulting examiner C. Jue, and to board-eligible in

25  internal medicine, Dr. Lin, as the "application of internal medicine to brain and rheumatology

26

27  _____

       [12]  Exhibits 1F through 3F consist of Kaiser records from 2005 to 2008 [AR at 203-549], and
28  Dr. Lin's June 2008 evaluation.  [AR at 550-57.]

problems remains unexplained in this record." [JS at 14-15 (citations omitted).]

Defendant argues that Dr. Lin's examination of plaintiff was consistent with his opinion. [AR at 18-19.] Defendant also argues that "the ALJ properly noted that *Dr. Jue's* opinion supports Dr. Lin's opinion." [JS at 19 (citing AR at 2323) (emphasis added).] According to defendant, plaintiff's "attempts to call Dr. Jue's credentials into question" are "meritless as the form clearly identifies Dr. Jue as a 'medical consultant.'" [JS at 19-20 & n.5.] However, there *is* no evidence presented by defendant or otherwise that C. Jue has any kind of medical qualifications (whether M.D., D.O., Ph.D., N.P., P.A., R.N., or any other). In fact, both Dr. Lin and Dr. Pierce directed their consultative evaluations to the attention of "C. Jue" and stated that the evaluation had been performed "at the request of your department," i.e., the Department of Social Services. [See AR at 550, 558.] Moreover, the Court was unable to locate any information confirming that an individual with that last name and first initial was licensed as an acceptable medical source by the State of California in 2008.[13]

Defendant further argues that there is no requirement that a medical expert review the entire record before he or she renders an opinion regarding a claimant's functional abilities, or before the ALJ renders a decision, and, therefore, the ALJ "may rely on relevant medical opinions that are consistent with the evidence, no matter when those opinions were issued." [JS at 20 (citations omitted).[14]] However, not only was the ALJ's reason for discounting Dr. Luisiri's and Dr. Rodriguez' opinions on the basis of plaintiff's purported daily activities legally insufficient as

---

[13] The Court's search of the California Department of Consumer Affairs license verification website, however, reflected that there were no physicians or surgeons licensed in California with the first name beginning with the letter C and the last name Jue, and that the only such individuals in the State of California who *may have had* active licenses in 2008, were licensed in the following fields: (1) cosmetology; (2) registered nurse (license expired in October 31, 2018); (3) registered pharmacist (license expired on September 30, 2012); (4) public health nurse (license expired on July 31, 2018); (5) registered nurse (currently residing in Alameda County); and (6) dentist (license expired on January 31, 2013). See https://search.dca.ca.gov/ (last visited on April 4, 2019).

[14] The out-of-district case cited by defendant for the proposition that an ALJ may rely on relevant medical opinions that are consistent with the record, no matter when those opinions were issued [JS at 20 n.6 (citing Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011))], is distinguishable from the circumstances in this matter. In that case, unlike here, there were no acceptable treating source medical opinions before the ALJ. Chandler, 667 F.3d at 362.

discussed above, the ALJ also never weighed those opinions according to the requisite factors, such as the nature, extent, and length of the physician-patient working relationship, the frequency of examinations, whether the physician's opinion is supported by and consistent with the record, and the specialization of the physician. Trevizo, 871 F.3d at 676. "This failure alone constitutes reversible error." Id.

Defendant also states that the ALJ properly found that Dr. Luisiri's and Dr. Rodriguez' opinions were inconsistent with plaintiff's activities, and that plaintiff herself "reported activities that belied" their restrictions [JS at 20-21] -- both arguments that the Court has already rejected herein. Defendant further suggests that plaintiff's arguments regarding the specializations of Drs. Luisiri and Rodriguez, "ignores that Drs. Lu[i]siri and Rodriguez's opinions were completely inconsistent with the medical evidence, including their own treatment records." [JS at 23 (citations omitted).] As this was not a reason given by the ALJ for discounting the opinions of Dr. Luisiri and Dr. Rodriguez, the Court will not address it herein.

Defendant also makes much of Dr. Luisiri's notation that there was "'some discrepancy' between the impairments, physical findings, and functional limitations when explaining that Plaintiff's impairments were not reasonably consistent with the functional limitations described in [Dr. Luisiri's] questionnaire," and then summarizes Dr. Luisiri's objective medical examination findings apparently attempting to illustrate the purported "discrepancy." [JS at 23-24 (citing AR at 1818).] However, Dr. Luisiri made this comment in response to item number 6 on the ER Questionnaire, which asked the following: "Are your patient's impairments (physical impairments plus any emotional impairments) *reasonably* consistent with the functional limitations described in this evaluation?" [AR at 1818 (emphasis in original).] Dr. Luisiri opined in response to item number 5 on the ER Questionnaire that plaintiff's emotional stress makes her pain worse [id.], and in response to item numbers 2 and 3 that she had the impairments of fibromyalgia, inflammatory arthritis, and chronic pain, with joint swelling. [Id.] He then completed the Environmental Restrictions portion of the ER Questionnaire. [AR at 1821.] Dr. Luisiri's comment regarding there being "some discrepancy" between plaintiff's physical and emotional impairments and his evaluation of plaintiff's limitations "*in this evaluation*," thus was referring to the *environmental*

limitations assessed by Dr. Luisiri on that form, i.e., the extent to which plaintiff could tolerate extreme cold, extreme heat, high humidity, wetness, fumes, dust, and chemicals, to which Dr. Luisiri stated plaintiff should "avoid all exposure." [AR at 1821.] It is not unreasonable to assume that Dr. Luisiri was of the opinion that avoiding all exposure to these environmental conditions could be seen by others as somewhat discrepant with plaintiff's impairments. Most relevant, however, is that neither Dr. Luisiri's physical examination results, nor how much weight Dr.Luisiri found plaintiff could lift and carry, nor how long she could sit, stand, or walk, and so on, were implicated in his responses to the ER Questionnaire.

Additionally, the Court agrees with plaintiff that the ALJ's failure to weigh the opinions of Dr. Luisiri and Dr. Rodriguez according to such factors as the nature, extent, and length of the treating relationship, and their specializations against the opinions of Dr. Lin and C. Jue, under the circumstances herein, was error. Trevizo, 871 F.3d at 676.

Based on the foregoing, the Court finds that the ALJ failed to provide specific and legitimate reasons, supported by substantial evidence, to give controlling weight to Dr. Lin and C. Jue instead of to plaintiff's treating physicians Dr. Luisiri and Dr. Rodriguez.

### 3. Dr. Maze

On June 25, 2014, Dr. Maze conducted a neurological evaluation. [AR at 1680-91.] In her report, she stated that she had reviewed supporting medical documents; obtained a history from plaintiff; conducted a physical examination; conducted a neurological examination; and completed a Work Questionnaire. [Id.] During that visit, plaintiff related that she has generalized weakness; problems with recall; daily pain; is only pain-free 2-4 days out of a month; has aching in her left shoulder, neck, and back (worsened by hot weather); is unsteady and recently fell on the stairs at her home; and has been told that she most likely has fibromyalgia, inflammatory arthritis, emphysema, and degenerative disease in the neck. [AR at 1681.] Dr. Maze's physical and neurological examinations reflected the following: plaintiff appeared depressed; she was cooperative and attentive; she exhibited slight generalized motor weakness in her upper extremities; she had normal grip strength; and she had intact sensation in the extremities. [AR

at 1681-82.] Dr. Maze also noted that plaintiff's brachioradialis, triceps, biceps, patellar, and Achilles reflexes were absent (normal is 2+). [AR at 1682.] She opined that, based on her formal physical examination, formal testing, and "careful observation of [plaintiff's] spontaneous actions during the contact period," plaintiff suffered from chronic pain syndrome, and had the following functional limitations:  could sit for 2 hours at a time and stand or walk for 1 hour at a time without interruption; could sit a total of six hours in an 8-hour workday, and stand or walk a total of 2 hours in an 8-hour workday; could occasionally reach overhead bilaterally; frequently reach, handle, finger, and feel with her right hand; occasionally push/pull with her right hand; occasionally reach, handle, finger, feel, and push/pull with her left hand; and frequently operate foot controls bilaterally.  [AR at 1685-86.]   She also determined that plaintiff could never climb stairs, ramps, ladders or scaffolds; and could frequently balance, stoop, kneel, crouch, and crawl.  [AR at 1687.] She assessed that plaintiff could frequently tolerate exposure to unprotected heights, moving mechanical parts, humidity, wetness, dust, fumes, extreme heat and cold, and vibrations.  [AR at 1688.]

The ALJ gave "some weight" to Dr. Maze's opinion as follows:

Dr. Maze . . . opined [plaintiff] was limited to a restrictive range of light work.  The undersigned agrees with the exertional limitation of light work.  However, the undersigned finds this opinion too restrictive given [plaintiff's] abilities to exercise, take care of personal tasks, and obtain treatment; and the generally limited positive examination findings.  Therefore, the undersigned finds the range of light work assessed herein to be more suitable.

[AR at 2323 (citation omitted).]

Plaintiff contends the reasons given by the ALJ for discounting Dr. Maze's opinion were not specific and legitimate or supported by substantial evidence.  She notes that other evidence in the record also reflects hand limitations and reiterates her argument that the ALJ did not adequately explain his reasoning with respect to the inconsistency of plaintiff's activities of daily living with Dr. Maze's report.  [JS at 26-29.]

Defendant argues that Dr. Maze's sitting and standing/walking limitations, and her opinion that plaintiff could never climb stars, ramps, ladders, or scaffolds, were not supported by Dr. Maze's examination, which reflected that plaintiff's gait was normal and stable, she did not need

an assistive device, she stood quickly from a seated position, her muscle strength in the upper extremities was only slightly reduced and was normal in the lower extremities, her coordination was normal, and she had depressed reflexes.  [JS at 30.]

For the same reasons discussed above, the ALJ's assertion that plaintiff's purported activities of daily living were inconsistent with the opinions of Dr. Luisiri and Dr. Rodriguez, also is not a legally sufficient reason, supported by substantial evidence, to discount the opinions of Dr. Maze.  Of particular note, the ALJ's determination that plaintiff's ability to "obtain treatment" was a valid reason to discount Dr. Maze's opinion is not logical.  If such a reason were found to be specific and legitimate, every opinion of any treating provider would be discounted because a claimant was able to "obtain treatment" from the provider.

The Court generally agrees, however, that some of Dr. Maze's functional limitations appear on the surface to be more restrictive than her own examination would warrant.  Nevertheless, Dr. Maze also noted that she had "carefully observed" plaintiff during the testing, and had also reviewed supporting medical documents, and it is reasonable to assume that these observations and materials may have impacted her overall functional assessment.

### 4.    Dr. Pierce

On June 9, 2008, Dr. Pierce conducted a psychological evaluation on plaintiff.  [AR at 558-62.]  Dr. Pierce also administered a mental status examination, the Wechsler Adult Intelligence Scale ("WAIS")-III, and the Wechsler Memory Scale ("WMS")-III.  [AR at 558.]  Dr. Pierce's source of information was plaintiff, whom he found to be a "quality historian" and reliable.  [Id.]  He noted some "hand-related pain behavior" during his examination; adequate effort, interest, and compliance; intellectual functioning within the "low, low average range"; a mildly muted mood and affect; plaintiff's report of feeling depressed, anxious, overwhelmed, and defeated; strong short-term memory and adequate long-term memory; adequate concentration and attention during the interview, but "mildly relatively challenged with attentionally-mediated testing; and insight and judgment were within normal limits.  [AR at 558-60.]  He diagnosed plaintiff with major depressive disorder ("by history, observation, and current medication"), and stated that she retained the

capacity to complete simple and repetitive vocational skills and to adapt to minimal changes in a work environment, but "for her significant deterioration, incapacity with ADLs and reports of confusion in the work setting thought to be legitimate, she is downgraded to the simplest level of work capacity, and is likely still deteriorating in this regard." [AR at 561-62.] He also found that she would have "mild-to-greater difficulty working effectively with others, due to present depressive adjustment, while she persists even despite pain today. She can remember and comply with simple one and two part instructions. She could concentrate just adequately for a regular work schedule for a full workweek." [AR at 562.]

Dr. Pierce re-examined plaintiff on June 16, 2014. He again conducted a complete psychological evaluation, including a mental status examination, the WAIS-IV, the WMS-IV, the Trails test parts A and B, and also reviewed (1) a June 4, 2014, record from her rheumatologist indicating "problems of inflammatory poly-arthritis, psoriasis, fibromyalgia and chronic pain"; (2) an SSA information form indicating "lesions on the brain, DDD [degenerative disc disease], spinal cord illness, fibromyalgia, CTS, osteoarthritis of the hands and possibly rheumatoid arthritis; and (3) a Kaiser completed EMG/NCV study indicating a "normal study with no EDX evidence for a lower motor neuron disease process." [AR at 1670-71.] She reported that plaintiff is able to dress and bathe herself, performs household chores occasionally, does not go shopping, and does not cook, she is able to drive although "mostly" her husband drives, and her husband handles her money. [AR at 1671-72.] Her mental status examination reflected that her intellectual functioning was in the low average to average range; her mood and affect were "mildly under-modulated, if appropriate to depressive content"; she reported feeling anxious and depressed; she reported experiencing suicidal thoughts and has anger concerns; her long-term memory was adequate and her short-term memory was "at borderline range"; her attention and concentration were adequate during the interview, but "somewhat mixed with attentionally-mediated testing," which was within the low (WAIS-IV Working Memory), average (Composites), and top borderline ranges (Processing Speed). [AR at 1673.] He noted that her processing speed was "the lowest among her IQ testing composites." [Id.] Dr. Pierce diagnosed plaintiff with depressive disorder, NOS, and opined that she retained "the mental capacity to complete only simple and repetitive-to-somewhat

higher demand vocational skills and to adapt to minimal changes in a work environment." [AR at 1675.] He deemed this to be "a significant downgrade from her premorbid reported positions of working as an administrative assistant production coordinator and 'with manager' in previous vocations." [Id.] He concluded as follows:

> [Plaintiff] would have none to mild difficulty working effectively with others, to the extent she seems to have retained her social skills, while she is clearly lower energy with significant depressive and anxious symptoms at present. She can remember and comply with simple one and two part to somewhat higher demand instructions. She could concentrate adequately only for a substantially reduced regular work schedule for a full workweek than she was capable of completing premorbidly.

[Id.]

The ALJ stated the following with respect to Dr. Pierce's opinions:

> In determining [plaintiff's] mental residual functional capacity, the undersigned gives some weight to the opinions of the State agency and the consultative examiner, Dr. Pierce's, first opinion dated June 9, 2008. The undersigned generally agrees with the mental limitations. However, in consideration of her allegations, the undersigned assesses slightly more restrictive, and specific, mental limitations, and finds [plaintiff] also limited to occasional contact with co-workers.
>
> The undersigned gives little weight to Dr. Pierce's second opinion dated June 16, 2014 that stated [plaintiff] was only able to concentrate for a substantially reduced regular work schedule. The undersigned finds this too limiting. In light of [plaintiff's] admitted ability to handle her money, obtain and consent to invasive treatment, and successfully complete the consultative examinations, the undersigned finds [plaintiff] able to work within the residual functional capacity herein.

[AR at 2323 (citations omitted).]

Plaintiff reiterates her arguments (as discussed above) regarding the ALJ's reliance on plaintiff's "admitted ability to handle her money, obtain and consent to invasive treatment, and successfully complete the consultative examinations." [JS at 40.] She notes that the facts that she can handle her money, obtain and consent to treatment, and complete a consultative examination, does not mean that she can perform work activities eight hours a day, five days a week. [Id.] She contends that the ALJ's reasons "lack[] logic and rationality." [Id. (citations omitted).] She also contends that the record supports Dr. Pierce's 2014 opinion that plaintiff is able to concentrate only for a substantially reduced regular work schedule/work week, and that the VE testified that a person who cannot sustain adequate concentration for a regular workweek "cannot engage in substantial gainful activity." [JS at 41 (citing AR at 2348).] Plaintiff submits

that Dr. Pierce's opinion that plaintiff cannot concentrate adequately to sustain a regular workweek should be credited as true and that the immediate award of benefits is warranted.  [Id. (citations omitted).]

Defendant responds that the ALJ "cited to substantial evidence in support of his findings regarding Plaintiff's mental limitations, including the opinions from the State agency doctor and [Dr. Pierce], himself."  [JS at 42.]  Defendant reiterates her argument that the ALJ can properly discredit a doctor's opinion "for being inconsistent with the record, including Plaintiff's admitted daily activities."  [Id.]  She argues that Dr. Pierce's June 2014 report itself is inconsistent with his conclusions; that Dr. Maze's examination, which was conducted a week after Dr. Pierce's second examination, also contradicts Dr. Pierce's June 2014 opinion; and that other medical evidence -- such as Dr. Rodriguez' and other providers' normal mental status results; medical records reflecting that plaintiff's depression was stable, unchanged, and well-controlled; medical records reflecting plaintiff showed "significant benefit from her overall treatment plan"; and global assessment of functioning scores reflecting only mild symptoms; also belie Dr. Pierce's "extreme opinion."  [JS at 42-45.]  Defendant opposes  plaintiff's request to credit Dr. Pierce's opinions as true, because (1) Dr. Pierce's opinions contradict each other; and (2) the ALJ's mental RFC assessment is even more restrictive than Dr. Pierce's opinions.  [JS at 45.]

The ALJ, once again, relied on plaintiff's activities of daily living to discount Dr. Pierce's 2014 opinion regarding plaintiff's reduced inability to concentrate, i.e., her "admitted ability to handle her money, obtain and consent to invasive treatment, and successfully complete the consultative examinations."  [AR at 2323.]  The reasons previously discussed by the Court for finding that these were not specific and legitimate reasons supported by substantial evidence to discount the opinions of Dr. Luisiri, Dr. Rodriguez, and Dr. Maze, apply equally with respect to the 2014 opinion of Dr. Pierce regarding plaintiff's reduced ability to concentrate.  Furthermore, the ALJ ignored Dr. Pierce's finding at both examination sessions, that although plaintiff was able to concentrate sufficiently to complete the interview portion of his examination, her results on testing that was "attentionally-mediated" reflected mixed results on both dates.  [AR at 560, 1673.]

Based on the above, the ALJ did not provide a specific and legitimate reason supported by

substantial evidence to discount the 2014 opinion of the consultative examining psychologist, Dr. Pierce.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits. Trevizo v. Berryhill, 871 F.3d 664, 682 (9th Cir. 2017) (citation omitted). Where (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand, it is appropriate to exercise this discretion to direct an immediate award of benefits. Garrison, 759 F.3d at 1020 (setting forth the three-part credit-as-true standard for exercising the Court's discretion to remand with instructions to calculate and award benefits); see also Lingenfelter, 504 F.3d at 1041; Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. See Benecke, 379 F.3d at 593-96; see also Connett v. Barnhart, 340 F.3d 871 (9th Cir. 2003) (cautioning that the credit-as-true rule may not be dispositive of the remand question in all cases, even where all three conditions are met). In Garrison, the Ninth Circuit, noting that it had never exercised the flexibility set forth in Connett in a published decision, clarified that the nature of that flexibility is "properly understood as requiring courts to remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." Garrison, 759 F.3d at 1020-21.

In this case, under Connett, the Court finds that remand for payment of benefits is appropriate because, as discussed above, the ALJ failed to provide legally sufficient reasons for rejecting or discrediting medical opinion evidence, and an evaluation of the record as a whole does not create serious doubt that plaintiff is, in fact, disabled. That is because the VE testified there

would be no work for an individual with the limitations found by Dr. Luisiri, Dr. Rodriguez, and to some extent Dr. Maze.[15]  [AR at 2346-47.]

Accordingly, because the ALJ failed to provide legally sufficient reasons for rejecting the treating providers' opinions, and because all three factors favoring remand for an award of benefits are satisfied, remanding for further administrative proceedings "would serve no useful purpose and would unnecessarily extend [plaintiff's] long wait for benefits." Benecke, 379 F.3d at 595; see also Regennitter v. Comm'r, 166 F.3d 1294, 1300 (9th Cir. 1999) (where the court "conclude[s] that . . . a doctor's opinion should have been credited and, if credited, would have led to a finding of eligibility, we may order the payment of benefits.").  That being said, Dr. Luisiri stated that he began treating plaintiff in September 2008, and on June 25, 2014, Dr. Rodriguez also indicated that he had been treating plaintiff for "7.5 years," which would also be approximately mid-2008. The Court finds, therefore, and as no more specific date exists in the record to establish the onset of disability, that based on these opinions, the record reflects that plaintiff became disabled as of December 31, 2008.

/

/

/

/

---

[15]    The VE testified that there would be no work available for an individual with the following RFC:  lifting and carrying ten pounds occasionally, and less than ten pounds frequently; standing, walking, or sitting for two hours in an eight-hour workday; never performing postural limitations like stooping, crouching, or climbing; should avoid all exposure to environmental conditions; frequent handling and fingering; and unskilled work with occasional contact with coworkers and the public. [AR at 2347-48.]  These were the limitations assessed by Dr. Luisiri, Dr. Rodriguez, and/or Dr. Maze.

**VII.**

**CONCLUSION**

**IT IS HEREBY ORDERED** that: (1) the decision of the Commissioner finding non-disability prior to December 31, 2015, is **reversed**; and (2) this action is **remanded** to defendant for payment of benefits, as appropriate, from the disability date of December 31, 2008.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  April 11, 2019

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE